Laura Scileppi
Richard Weiss
DUNNEGAN & SCILEPPI LLC
437 Madison Avenue, 24th Floor
New York, New York 10022
(212) 332-8300

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ZEIKOS INC., <br><br> *Plaintiff*, <br><br> -against- <br><br> WALGREEN CO., <br><br> *Defendant*. | 21-cv-19993 <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff Zeikos Inc. ("Zeikos"), with its principal place of business at 19 Progress Street, Edison, New Jersey 08820, by its undersigned attorneys, for its complaint against Walgreen Co. ("Walgreen"), alleges:

**NATURE OF THE CASE**

1. This action arises out of a ten-year supplier-customer relationship between Zeikos and Walgreen. For more than eight years, until the middle of 2019, Zeikos and Walgreen maintained a professional, and mutually beneficial, relationship. This relationship, however, then began to deteriorate, as Walgreen shifted its strategy from making money by selling products to making money by squeezing its suppliers. Zeikos now alleges that Walgreen breached its contracts with Zeikos, including those entered into on (a) October 7, 2019, and amended April 1, 2020, and (b) January 20, 2021, causing Zeikos substantial amounts of damages.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(a)(1).

   a. Zeikos is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Edison, New Jersey.

   b. Walgreen is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Deerfield, Illinois.

   c. The amount in controversy exceeds $75,000, exclusive of interest and costs.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District.

## BACKGROUND OF THIS ACTION

**A.  The Parties**

4. Zeikos is, and has been since 2005, engaged in the business of importing and selling, to retailers located throughout the United States, electronic accessories, such as earphones, battery chargers and speakers. Zeikos sells most of its products under the trademark iHip®. The senior officers of Zeikos include Jack Saideh ("Saideh"), President, and James Trappani ("Trappani"), Vice-President.

5. Walgreen is a subsidiary of Walgreens Boots Alliance, Inc. ("WBA"), one of the largest retail pharmacy chains in the United States and Europe, with approximately 13,000 stores, 315,000 employees and $132.5 billion in sales. In 2021, Fortune Magazine ranked WBA as the 16th largest company in the United States.

**B.     The Early Dealings Between The Parties**

6.     Zeikos has a long history of selling electronic accessories to Walgreen. The relationship began in about 2011, with an individual salesperson at Zeikos selling to one individual Walgreen store.  Beginning in about 2013, the relationship evolved to a Zeikos-appointed firm of sales representatives selling to Walgreen's buyer in Walgreen's corporate offices.  Beginning in 2015, the relationship further evolved to the senior officers of Zeikos selling directly to Walgreen's buyer in Walgreen's corporate offices.

7.     When the senior officers of Zeikos began selling directly to Walgreen, Zeikos dealt with the buyer for the electronic accessories category.  The sales relationship between Zeikos and Walgreen during that time period generally involved Walgreen giving Zeikos a purchase order, and Zeikos filling that purchase order.

**A FIRST CLAIM FOR RELIEF**
**(Breach of Contract – The Amended And**
**Restated Product Placement Agreement)**

8.     Zeikos repeats the allegations in paragraphs 1 through 7 above as if set forth in full.

9.     During the second quarter of 2019, the relationship between Zeikos and Walgreen began to change, as Walgreen pursued a strategy of generating profits by squeezing its suppliers, including Zeikos, for concessions that went straight to Walgreen's bottom line.

10.     On or about May 14, 2019, Saideh and Trappani met with Walgreen's new buyer for the electronic accessories category, Albert Gehrke ("Gehrke").

11.     At that meeting on or about May 14, 2019, Gehrke told Saideh and Trappani that Walgreen would be offering a new type of business arrangement, and that Zeikos may be interested in participating.  Gehrke stated that, in the new business

arrangement, vendors could bid on the right to sell their merchandise in certain highly desirable sections of Walgreen stores, designated the "010" Space and the Saddle Fixtures (collectively, the "Premium Space"). The "010" Space is the portion of a Walgreen store immediately adjacent to the cash registers, that customers must pass as they check out. In many Walgreen stores without a layout for "010" Space, Walgreen used Saddle Fixtures, clear plastic shelves placed over an existing fixture near the cash registers. The Premium Space was among the most valuable, if not the most valuable, location in Walgreen stores.

12. At that meeting on or about May 14, 2019, Gehrke also stated to Saideh and Trappani that, in the prior year, Walgreen had assigned the Premium Space to a private label vendor, and before that Walgreen had assigned the Premium Space to a brand name vendor, "Tech&Go."

13. At that meeting on or about May 14, 2019, Gehrke then represented to Saideh and Trappani that the private label vendor had sold between $80,000,000 and $100,000,000 a year of merchandise from the Premium Space, and prior to that Tech&Go had sold at least $250,000,000 a year of merchandise from the Premium Space.

14. After a series of negotiations, and relying on Walgreen's representations regarding the sales of the private label vendor and Tech&Go, Zeikos ultimately offered Walgreen a $9,000,000 payment to have Zeikos's merchandise placed in the Premium Space for one year. Walgreen agreed.

15. On or about August 27, 2019, Gehrke presented Zeikos with a draft of a contract concerning the Premium Space (the "Product Placement Agreement").

16. On or about September 21, 2019, Zeikos executed the Product Placement Agreement, a copy of which is attached as Exhibit A, and transmitted it to Walgreen.

4

17. The Product Placement Agreement provided, among other things, that (a) Walgreen would purchase certain types of Zeikos's merchandise (the "Merchandise") and place that Merchandise in the Premium Space, and (b) Zeikos would provide Walgreen with a credit of $9,000,000 against Walgreen's purchases of that Merchandise. $5,000,000 of that $9,000,000 was an immediate credit to Walgreen.

18. The Product Placement Agreement also provided in paragraph 5 that:

> "The term of this Agreement shall commence on the Effective Date and continue for one (1) year (the "**Initial Term**"). The placement space on the Fixtures shall be re-bid to various vendors after one year if the Merchandise does not achieve One Hundred Million and No/100 Dollars ($100,000,000) in Net Sales during the Initial Term."

19. Walgreen executed the Product Placement Agreement on or about October 7, 2019.

20. On or about October 18, 2019, Walgreen issued a purchase order to Zeikos for $8,000,000 of Merchandise, and promptly took the immediate credit of $5,000,000 from Zeikos.

21. On February 4, 2020, Saideh and Trappani spoke by phone with Amanda Corbett and Gehrke of Walgreen. They discussed a re-negotiation of the Product Placement Agreement.

22. On or about April 1, 2020, the parties entered into an Amended and Restated Product Placement Agreement, a copy of which is annexed as Exhibit B. The Amended and Restated Product Placement Agreement did not contain any release.

23. The Amended and Restated Product Placement Agreement was an enforceable, superseding contract between Zeikos and Walgreen.

24. Zeikos's sales to Walgreen under the Product Placement Agreement and the Amended and Restated Product Placement Agreement failed to meet, or even

approach, Zeikos's expectations. During the more than one year period between the execution of the Product Placement Agreement on or about October 7, 2019, and December 31, 2020, Zeikos's sales of the Merchandise to Walgreen for the Premium Space did not exceed $20,000,000, representing retail sales of less than $40,000,000.

25. Walgreen breached the Amended and Restated Product Placement Agreement in at least the following ways.

A. **Failure To Place The Merchandise In 5,000 Stores**

26. The Amended and Restated Product Placement Agreement required Walgreen to place Zeikos's Merchandise in the "010" Space in at least 3,000 stores and in the Saddle Fixtures in at least 2,000 stores.

27. The Amended and Restated Product Placement Agreement provided "[i]f Walgreen[] no longer displays the Merchandise on Fixtures in at least 5,000 stores, Walgreen shall refund Vendor a pro-rata portion of the amount Vendor paid Walgreen for such Merchandise placement during the then-current Term for such discontinued Fixtures that bring the total store count less than 5,000."

28. In addition, the Amended and Restated Product Placement Agreement required Walgreen, in the 2,000 stores that contained Saddle Fixtures, to place each item of Zeikos's Merchandise in the Saddle Fixtures.

29. Upon information and belief, Walgreen failed to meet its obligation under the Amended and Restated Product Placement Agreement to place Zeikos's Merchandise in 5,000 stores.

B. **Failure To Place The Merchandise In Proper Locations In The Stores**

30. The Amended and Restated Product Placement Agreement provided "[i]f Walgreen changes the Fixtures or moves such Fixtures to other areas in the stores,

6

Walgreen shall use it [sic] best efforts to provide Vendor similar placement during the remainder of the then-current Term with similar amount of customer traffic as the 010 fixture and/or saddle fixture, as applicable."

31. Upon information and belief, for the stores in which Walgreen placed the Merchandise, Walgreen failed to meet its obligation under the Amended and Restated Product Placement Agreement to either place the Merchandise in the Premium Space or provide "similar placement."

C. **Failure To Properly Present The Merchandise**

32. Walgreen's obligations under the Amended and Restated Product Placement Agreement included an implied obligation to present the Merchandise in the Premium Space in a commercially reasonable manner. This included, without limitation, the obligation to (a) use fixtures that fit the packaging of the Merchandise, and did not leave substantial empty spaces, (b) place mylar labels for each item of Merchandise next to that item, and (c) keep the Saddle Fixtures free from obstruction from other fixtures and products.

33. Upon information and belief, at all relevant times, Walgreen failed to meet its obligations to present the Merchandise in a commercially reasonable manner.

D. **Failure To Pay For Goods Sold And Delivered**

34. Since October 21, 2019, through December 31, 2020, Walgreen placed purchase orders with Zeikos under the Amended and Restated Product Placement Agreement totaling less than $20,000,000. Zeikos has delivered that Merchandise, and sent invoices to Walgreen for the corresponding amounts.

35. Since October 21, 2019, through December 31, 2020, Walgreen paid Zeikos about $11,850,000, and took authorized credits of about $7,500,000 on account of these invoices.

36. By letter dated October 6, 2021, Zeikos has demanded payment of amounts due and owing under the Amended and Restated Product Placement Agreement. Walgreen has failed to pay the amounts due to Zeikos, without justification.

37. As a result of each of the above breaches by Walgreen, Zeikos has sustained damages in an amount to be determined by the trier of fact in this action.

## A SECOND CLAIM FOR RELIEF
### (Breach of Contract – The January 2021 Contract)

38. Zeikos repeats the allegations in paragraphs 1 through 37 above as if set forth in full.

39. In the beginning of 2021, both Zeikos and Walgreen considered their future business concerning the Premium Space. Both parties contemplated that Zeikos's Merchandise would remain in that Premium Space, and that Zeikos would provide Walgreen with some price concessions.

40. With respect to those price concessions, Walgreen initially sought a fixed payment from Zeikos of $6,000,000. Zeikos counter-offered with a 20 percent discount on Zeikos's list price. Walgreen ultimately accepted Zeikos's counter-offer of that 20 percent discount.

41. As the result of an exchange of e-mails on January 20, 2021, Zeikos and Walgreen entered into a contract. On January 20, 2021, at about 5:00 p.m., Gehrke emailed Saideh and attached two, one-page sets of material contract terms. That email

constituted an offer, and stated "the attached deal needs to be signed before any future purchase orders will be placed."

42.     The material terms of one attachment to the January 20, 2021, email of Gehrke, provided:

Please review the following deal negotiation. Approve by replying to this email and typing your name and the approval date.

| 1 | Category Manager | 027 GEHRKE |
|---|---|---|
| 2 | Vendor Name and Number | ZEIKOS (099158) |
| 3 | Deal Type, Sub-Type, or Business Purpose | 055 Base Allowance |
| 4 | Performance Period | 1/21/21 to 12/31/2021 |
| 5 | Total Estimated Earnings | $2,000,000.00 |
| 6 | Terms of Deal | 20% off Invoice deduction |
| 7 | Means of Collection | Deduction |
| 8 | Billing Calculation Type | Vendor Wide - All items mapped to the CM & vendor will be included in calculation |
| 9 | Billing Frequency | Monthly |
| 10 | Invoice Remarks | 20% deduction for 010/saddle program |

Walgreens Notes
20% off invoice deduction for 010/saddle placement
For Deal Team: System to Calculate = System, CM to Approve = No, Renewable Reminder = No, Select PO by Buy Date, Calculate Earnings by PO Receipt Amounts, Subtract PO Returns from Earnings = Yes

43.     Minutes later, Saideh emailed to Gehrke the signed documents, which accepted the offer, a copy of which are annexed as Exhibit C.

44.     Walgreen's offer and Zeikos's acceptance of that offer resulted in the formation of a contract on January 20, 2021 (the "January 2021 Contract").

45.     Although Gehrke's January 20, 2021, e-mail provided that a "more formal agreement will follow," a formal agreement was unnecessary. Walgreen did not transmit to Zeikos a more formal agreement until April 8, 2021. Then, after Zeikos provided to Walgreen some preliminary comments on April 19, 2021, Walgreen did not respond.

46.     Walgreen breached the January 2021 Contract in at least the following ways.

9

A. **Early Termination Of The Contract**

47. Based upon the language of the contract providing for a "Performance Period" until "12/31/21," neither party intended that the other party could unilaterally, without an uncured breach, terminate the January 2021 Contract before the end of the performance period on December 31, 2021.

48. Events after the formation of the January 2021 Contract confirm that Walgreen did not intend that it would be able to terminate that contract during its initial one-year term, without a material breach by Zeikos, simply by giving 60 days' notice. The draft contract that Walgreen sent to Zeikos on April 8, 2021, provided in applicable part:

> "**Term, Termination**. The term of this Agreement shall commence on January 1, 2021 and continue for one (1) year (the "**Term**"). The Term will automatically renew for additional one (1) year periods unless one Party provides the other party at least sixty (60) days' prior written notice of its intention to terminate this Agreement at the end of the then-current Term. Either party may terminate the Agreement for any or no reason by giving at least sixty (60) days' written notice of termination to the other party. Either party may terminate this Agreement upon fifteen (15) days' written notice if the other party fails to cure a breach of this Agreement for which the non-breaching party provided notice thereof and thirty (30) days to cure."

49. This language demonstrated that, except to prevent an automatic renewal, Walgreen understood that neither party had the option to cancel the contract by giving 60 days' notice. The first sentence confirmed that the proposed contract would have a one-year term. The second sentence provided that the one-year term would automatically renew unless a party provided 60 days' notice. The third sentence provided that this 60 days' notice, to prevent the automatic renewal, could be for any reason. The fourth sentence provided that the contract could be terminated upon 15 days' notice as the result of an uncured breach.

50. However, by e-mail of Gehrke on August 27, 2021, Walgreen purported to unilaterally terminate the January 2021 Contract, stating:

> "Please let this email serve as 60 day notice that Walgreen will be ending our exclusive relationship with Zeikos in regards to iHip branded product on Walgreen 010/saddle fixture, effective 10/29/21. We will no longer be purchasing the product associated with these fixtures and will begin marking product down in our stores beginning 9/1/21, please alert Walgreen by 8/31/21 if there is any product Zeiko's [sic] would prefer to be called in and returned to Zeikos. The standard call in fee's [sic] would apply for this activity as outlined in section 4.4 of our agreement if you choose for product to be returned.
>
> Please understand this decision is final, thank you."

51. Walgreen's early termination of the January 2021 Contract constitutes a breach of the January 2021 Contract.

**B.     Failure To Place The Merchandise in 5,000 Stores**

52. As it did under the Amended and Restated Product Placement Agreement, Walgreen had an obligation under the January 2021 Contract to place Zeikos's Merchandise in the "010" Space in at least 3,000 stores and in the Saddle Fixtures in at least 2,000 stores.

53. In addition, as it did under the Amended and Restated Product Placement Agreement, the January 2021 Contract required Walgreen, in the at least 2,000 stores that contained Saddle Fixtures, to place each item of Zeikos's Merchandise in the Saddle Fixtures.

54. Upon information and belief, Walgreen failed to meet its obligation under the January 2021 Contract to place Zeikos's Merchandise in 5,000 stores.

**C.     Failure To Properly Present The Merchandise**

55. As it did under the Amended and Restated Product Placement Agreement, Walgreen had an implied obligation under the January 2021 Contract to place the

Merchandise in the Premium Space in a commercially reasonable manner.  That included, without limitation, the obligation to (a) use fixtures that fit the packaging of the Merchandise, and did not leave substantial empty spaces, (b) place mylar labels for each item of Merchandise next to that item, and (c) keep the Saddle Fixtures free from obstruction from other fixtures and products.

56.     Upon information and belief, Walgreen failed to meet its obligations to present the Merchandise in a commercially reasonable manner, as described above.

**D.     Failure To Pay For Goods Sold And Delivered**

57.     Since January 21, 2021, Walgreen placed purchase orders with Zeikos under the January 2021 Contract totaling about $8,800,000.  Zeikos has delivered that Merchandise and sent invoices to Walgreen for the corresponding amounts.

58.     Since January 21, 2021, Walgreen paid Zeikos about $5,285,000, and took authorized credits of about $3,520,000 on account of these invoices.

59.     By letter dated October 6, 2021, Zeikos has demanded payment of amounts due and owing.  Walgreen has failed to pay the amounts due to Zeikos, without justification.

60.     As a result of each of the above breaches by Walgreen, Zeikos has sustained damages in an amount to be determined by the trier of fact in this action.

**A THIRD CLAIM FOR RELIEF**
**(Breach of Contract – Failure To Pay For Goods Sold And Delivered)**

61.     Zeikos repeats the allegations in paragraphs 1 through 60 above as if set forth in full.

62.     In addition to the purchase orders Walgreen placed with Zeikos pursuant to the Amended and Restated Product Placement Agreement and the January 2021

12

Contract, Walgreen placed purchase orders with Zeikos for certain electronic accessories that Walgreen could place in the store at its discretion ("Discretionary Merchandise").

63. Since October 21, 2019, Walgreen placed purchase orders with Zeikos for Discretionary Merchandise totaling about $6,575,000. Zeikos has delivered that Discretionary Merchandise to Walgreen, and sent invoices to Walgreen for the corresponding amounts.

64. Since October 19, 2019, Walgreen paid Zeikos about $3,950,000, and took authorized credits of about $2,500,000 on these invoices.

65. By letter dated October 6, 2021, Zeikos has demanded payment of amounts due and owing. Walgreen has failed to pay the amounts due to Zeikos, without justification.

66. As a result of Walgreen's breach, Zeikos has sustained substantial damages in an amount to be determined by the trier of fact in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Zeikos demands judgment against Walgreen:

A. Awarding Zeikos damages in an amount on its claims to be determined at the trial of this action, which is an amount in excess of $75,000 exclusive of interest and costs;

B. Awarding Zeikos its costs in this action; and

C. Granting such other and further relief as to this Court seems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Zeikos demands a trial by jury of all issues in this action that are so triable.

                                                        DUNNEGAN & SCILEPPI LLC

                                                        By _____
                                                                       Laura Scileppi

Dated: November 15, 2021                         *Attorneys for Plaintiff*

## CERTIFICATE OF NO RELATED ACTION

Laura Scileppi, attorney of record for the plaintiff, hereby declares pursuant to 28 U.S.C. § 1746 that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Executed November 15, 2021.

_____
Laura Scileppi